1  Robert J. Nelson (State Bar No. 132797)
   rnelson@lchb.com
2  Fabrice N. Vincent (State Bar No. 160780)
   fvincent@lchb.com
3  Jacob H. Polin (State Bar No. 311203)
   jpolin@lchb.com
4  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
5  San Francisco, CA  94111-3339
   Telephone:  415.956.1000
6  Facsimile:  415.956.1008

7  Judith Ann Pavey (to be admitted *pro hac vice*)
   jpavey@starnlaw.com
8  STARN O'TOOLE MARCUS & FISHER
   A Law Corporation
9  Pacific Guardian Center, Makai Tower
   733 Bishop Street, Suite 1900
10 Honolulu, HI 96813
   Telephone: 808.537.6100
11 Facsimile: 808.537. 5434

12 Alexandra L. Foote (State Bar No. 225695)
   alexandra@afootelaw.com
13 LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
   275 Battery Street, 29th Floor
14 San Francisco, CA  94111-3339
   Telephone:  786.408.8083
15 Facsimile:  415.956.0561

16 *Attorneys for Plaintiff*
   Water Sports Kauai, Inc.
17
                    UNITED STATES DISTRICT COURT
18
                   NORTHERN DISTRICT OF CALIFORNIA
19
                       SAN FRANCISCO DIVISION
20

21 Water Sports Kauai, Inc., a Hawaii          Case No.   3:20-cv-3750
   corporation, dba Sand People, on behalf
22 itself and all others similarly situated,   **CLASS ACTION COMPLAINT**

23                Plaintiff,                    **DEMAND FOR JURY TRIAL**

24          v.                                  **1. BREACH OF CONTRACT,**
                                                **2. BREACH OF COVENANT OF GOOD**
25 Fireman's Fund Insurance Company, a             **FAITH AND FAIR DEALING,**
   California corporation, National Surety     **3. UNFAIR OR DECEPTIVE BUSINESS**
26 Corporation, an Illinois Corporation, and      **PRACTICES,**
   Allianz Global Risks US Insurance Co.,      **4. DECLARATORY RELIEF**
27 an Illinois Corporation

28                Defendants.

1997823.1                                                         COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     PARTIES ...................................................................................................................... 2

    A.      Plaintiff.......................................................................................................... 2

    B.      Defendants ..................................................................................................... 2

III.    JURISDICTION AND VENUE .................................................................................. 5

IV.     FACTUAL BACKGROUND ...................................................................................... 5

    A.      The Rapid Spread of Coronavirus................................................................. 5

    B.      Governments Around the Country Order Everyone to Shelter in Place ................ 7

    C.      Sand People Closes ........................................................................................ 9

    D.      The Losses From Sand People's Closure Are A Covered Business
        Interruption................................................................................................... 10

    E.      Defendants' Denial of Sand People's Insurance Claim ....................................... 13

V.      CLASS ACTION ALLEGATIONS .......................................................................... 16

VI.     CAUSES OF ACTION .............................................................................................. 19

FIRST CAUSE OF ACTION BREACH OF CONTRACT........................................................ 19

SECOND CAUSE OF ACTION BREACH OF COVENANT OF GOOD FAITH AND
    FAIR DEALING........................................................................................................... 20

THIRD CAUSE OF ACTION UNFAIR OR DECEPTIVE TRADE PRACTICES ................... 21

FOURTH CAUSE OF ACTION DECLARATORY RELIEF .................................................... 23

VII.    PRAYER FOR RELIEF............................................................................................. 25

VIII.   JURY TRIAL DEMAND ......................................................................................... 26

Plaintiff Water Sports Kauai, Inc., a Hawaii corporation, dba Sand People ("Sand People"), on behalf of itself and all others similarly situated, files this Complaint Against Defendants Fireman's Fund Insurance Company, a California corporation, National Surety Corporation, an Illinois Corporation, and Allianz Global Risks US Insurance Co, an Illinois Corporation  (collectively, "Defendants"),  and alleges as follows:

## I.    **INTRODUCTION**

1.      Sand People is a nearly thirty-five year old small business in Hawaii that sells gifts, artwork, décor, jewelry, glassware, coastal furnishing, apparel, soaps, lotions, candles, and books. It has twelve stores on three islands. Some are freestanding, others are located in hotels or shopping malls. Its inventory focuses on local designers

2.      Several months ago, Sand People was forced to suddenly and completely shut down.  This closure was ordered by the state of Hawaii and local authorities, which required that Sand People and its employees and customers "shelter in place" and abide by strict "social distancing" guidelines. The closure—and accompanying loss of income—forced Sand People to furlough and lay off employees.  Notwithstanding this, Sand People continued to fund medical benefits for its employees.  However, with mounting expenses and minimal income, Sand People's ability to continue making these payments may be limited.  Absent a reversal of the order or financial support, Sand People may have to consider even more drastic measures.

3.      To protect its business (and employees) from having to make such terrible choices in situations like this one, Sand People purchased insurance from Defendants that provided coverage for business interruption.  Sand People has maintained this policy with Defendants for almost thirty-five years.  Indeed, when it began furloughing employees, Sand People anticipated conducting re-hirings once Defendants began providing insurance coverage for Sand People's business shutdown.  Sand People's insurance policy expressly provides coverage for "Lost Business Income" and the consequences of actions by "Civil Authority."  Accordingly, Sand People understandably believed that its policy would help protect its business in the unlikely event that the government ever ordered it to stop or severely restrict operations (in connection with a pandemic or any other Covered Cause of Loss).

4.     Contrary to the coverage provisions in its policy with Sand People, and the obligations Defendants undertook in exchange for Sand People's insurance premium payments, Defendants summarily denied Sand People's claim for business interruption coverage.  This denial was part of a premeditated strategy by Defendants to deny all claims related to the "shelter in place" orders associated with COVID-19.  Sand People's decision to deny coverage was untethered to the facts of Sand People's claim, which Defendants did not adequately investigate, or the specific coverage provided by Sand People's policy, and was therefore illegal.

5.     The other members of the proposed Class (defined below) were subject to the same conduct by Defendants.  As a result of Defendants' wrongful conduct as alleged herein, Sand People and other Class members suffered damages and, absent appropriate injunctive and declaratory relief, will continue to be harmed by Defendants' misconduct.

## II.     PARTIES

### A.     Plaintiff

6.     Plaintiff Water Sports Kauai, Inc. is a Hawaii corporation that does business as and owns Sand People, a chain of 12 stores located in Hawaii with locations in Honolulu, Koloa, Haleiwa, Hanalei, Lahaina, and Kailua (the "stores).

### B.     Defendants

7.     Defendant Fireman's Fund Insurance Company ("Fireman's") is a California corporation with a principal place of business in Petaluma or Novato, California.[1]

8.     Fireman's was founded in 1863 in San Francisco, California.

9.     Fireman's principal place of business is located in Petaluma, California.

10.     Fireman's principal place of business was previously located in Novato, California (or is still located there).

11.     National Surety Corporation is an Illinois Corporation with a principal place of business in Petaluma or Novato, California.

---

[1] https://www.bloomberg.com/profile/company/11221Z:US; https://sec.report/CIK/0000315062; https://www.dnb.com/business-directory/company-profiles.firemans_fund_insurance_company.83378aab6912d41cd89b530ad70f4241.html.

12.     National Surety Corporation's principal place of business is located in Petaluma, California.

13.     National Surety Corporation's principal place of business was previously located in Novato, California (or is still located there).[2]

14.     National Surety Corporation is a subsidiary of Fireman's Fund.[3]

15.     National Surety Corporation is registered to do business in California.

16.     National Surety Corporation has a registered agent for service of process in California.

17.     National Surety Corporation has employees working in the insurance industry working in Petaluma or Novato, California.

18.     National Surety Corporation and Fireman's Fund are subsidiaries of Allianz.[4]

19.     Allianz Global Risks US Insurance Co. is an Illinois Corporation with a principal place of business in Chicago, Illinois.

20.     Allianz Global Risks US Insurance Co. is registered to do business and sell insurance in California.[5]

21.     Allianz Global Risks US Insurance Co. has a registered agent for service of process in California.

22.     Allianz Global Risks US Insurance Co. has employees working in the insurance industry in San Francisco, California.

23.     Allianz Global Risks US Insurance Co. has employees working in the insurance industry in California.

24.     Sand People's policy contains Allianz branding, indications of origin, and language suggesting that they are an Allianz policyholder.

---

[2] https://www.bloomberg.com/profile/company/NSTY:US
[3] https://www.sec.gov/Archives/edgar/data/1091439/000109143917000010/rorgchart.htm.
[4] http://www.insurance.ca.gov/01-consumers/150-other-prog/05-hei/hei-allianz.cfm;
https://www.sec.gov/Archives/edgar/data/1091439/000109143917000010/rorgchart.htm.
[5] http://www.insurance.ca.gov/01-consumers/150-other-prog/05-hei/hei-allianz.cfm.

25.     Defendants denied Plaintiff's insurance claim through correspondence which indicated on its face that it is from Allianz Global Corporate and Specialty and signed by an employee of "One of the Allianz Companies" with an e-mail address located at the website of Allianz Global Corporate and Specialty.

26.     Allianz Global Corporate and Specialty is a German corporation which operates in the United States through Allianz Global Risks US Insurance Co.

27.     Allianz's website identifies Allianz Global Corporate and Specialty as a foreign corporation operating through U.S. entities.[6]

28.     Allianz's website indicates that Allianz Global Corporate and Specialty operates in North America through "legal names" like Allianz Global Risks US Insurance Company.[7]

29.     At all relevant times, each Defendant (and/or Allianz Global Corporate and Specialty and other related Allianz entities) conducted business through the name of each other Defendant (and/or Allianz Global Corporate and Specialty and other related Allianz entities).

30.     At all relevant times, each Defendant directed, authorized, controlled, and/or participated in the conduct of every other Defendant (to the extent any independent conduct can be ascribed to these corporations).  Similarly, acts taken by each Defendant were within the course, scope, and authority of each and every other Defendants' directions, authorizations, and controls.  All actions of each Defendant alleged in each cause of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other Defendant.

31.     In committing the wrongful acts alleged herein, each of the Defendants pursued, or joined in the pursuit of, a common course of conduct, and has acted in concert and/or conspired with one another in furtherance of the improper acts and transactions that are the subject of this Complaint.

---

[6] https://www.agcs.allianz.com/about-us/structure-history.html
[7] Id.

**III.    JURISDICTION AND VENUE**

32.    This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a state different from that or those of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class consist of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

33.    This Court has personal jurisdiction over Defendants because Defendants did business in California, have sufficient minimum contacts in California, and otherwise intentionally availed themselves of the markets within California through their business activities, such that the exercise of jurisdiction by this Court is proper. Moreover, the claims of Plaintiff and numerous Class members in this case arise out of and directly relate to Defendants' contacts with California, including (but not limited to) the use of Defendants' offices and employees in California to develop, market, sell, analyze, modify, and deny coverage under insurance policies.

34.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants have marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this District, and Defendants denied insurance coverage for losses incurred by Plaintiff and other Class members in this District.

35.    Intra-District Assignment: This action is properly assigned to the San Francisco/Oakland Division which is proximate to Defendants' offices.

**IV.    FACTUAL BACKGROUND**

**A.    The Rapid Spread of Coronavirus**

36.    COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19"). The first instances of the disease spreading to humans were diagnosed in or around December 2019.

37.    According to the World Health Organization ("WHO"): "People can catch COVID19 from others who have the virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or

exhales.  These droplets land on objects and surfaces around the person.  Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth.  People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets."[8]

38.     This is problematic, *inter alia*, because a human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[9]

39.     According to a recent report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[10]  The more people in a conversation, the more droplets are dispersed.

40.     Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

41.     These droplets can spread Coronavirus when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[11]

42.     Droplets containing Coronavirus infect a variety of surfaces and objects for a period of hours, days, or weeks, if not longer.  After inspecting a cruise ship inhabited by passengers carrying the Coronavirus, the CDC reported that Coronavirus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[12]

---

[8] *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 21, 2020).

[9] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

[10] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

[11] *See*, *e.g.*, CDC website, "How COVID-19 Spreads*,*" 2020, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[12] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

43.     Recent scientific evidence shows that Coronavirus can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[13]

44.     Testing involving similar viruses in the Coronavirus family shows that Coronavirus can likely survive on ceramics, silicon rubber, or paper for up to five days if not longer.[14]

45.     When public areas containing such surfaces may have been exposed to Coronavirus, a number of countries including China, Italy, France, and Spain have required such areas to be fumigated prior to re-opening.[15]

46.     This Coronavirus has spread throughout Hawaii and the United States.

**B.      Governments Around the Country Order Everyone to Shelter in Place**

47.     As the Coronavirus spread in Hawaii, state and local officials began discussing wide scale business closures.

48.     On March 13, 2020 President Trump declared the COVID-19 outbreak a national emergency.

---

[13] *See* Neeltje van Doremalen, et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited April 21, 2020); Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited April 21, 2020).

[14] *See* Guenter Kampf, et al., "Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents," 104 Journal of Hospital Infection 246 (Feb. 6, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132493/pdf/main.pdf (last visited Apr. 21, 2020).

[15] *See* Mike Bird, et al., "China Is Open for Business, but the Postcoronavirus Reboot Looks Slow and Rocky," *The Wall Street Journal* (March 26, 2020), *available at* www.wsj.com/articles/china-is-open-for-business-but-the-post-coronavirus-reboot-looks-slow-and-rocky-11585232600 (last visited April 22, 2020); Jason Horowitz, "In Italy, Going Back to Work May Depend on Having the Right Antibodies," *The New York Times* (April 4, 2020), *available at* www.nytimes.com/2020/04/04/world/europe/italy-coronavirus-antibodies.html (last visited April 22, 2020); Sarah Elzas, "French Teachers Push Back against Reopening Schools in May," *RFI* (released online Apr. 14, 2020), *available at* www.rfi.fr/en/france/20200414-french-teachers-push-back-against-reopening-schools-in-may (last visited April 22, 2020); Claudia Nuñez, "On the Front Line of the Coronavirus Threat in Spain, Tractors Scatter the Streets with Hope," *Los Angeles Times* (March 27, 2020), *available at* www.latimes.com/world-nation/story/2020-03-27/on-the-front-line-of-the-pandemic-tractors-scatter-the-streets-with-hope (last visited April 22, 2020).

49.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19. This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from shopping malls, recreational facilities, bars, restaurants, and food courts.

50.     On March 16, 2020, Governor Ige issued a proclamation requiring that all residents heed orders and guidance of federal and state public health officials. This includes the aforementioned CDC guidance.

51.     On March 17, 2020, Governor Ige announced directives effective March 20, 2020 limiting the operation of non-essential businesses including Sand People's stores.

52.     On March 21, 2020, Governor Ige citing President Trump's March 13 declaration, issued a proclamation requiring all visitors to Hawaii to self-quarantine for 14 days upon arrival (except for visitors involved in critical emergency response or infrastructure functions). Ex. 1.

53.     On March 23, 2020 Governor Ige, citing CDC recommendations (and his prior proclamation citing President Trump's March 13 declaration), issued a proclamation requiring "all persons within the State of Hawai'i . . . to stay at home or in their place of residence" unless involved in essential activities. Ex. 2 § I.

54.     This proclamation's definition of essential activities does not include stores targeting visitors and/or selling souvenirs and other related goods. *Id.* at § I(A). It also places additional restrictions on the operation of recreational and other businesses. *Id.* at § I(C–D).

55.     Governor Ige's proclamations were subsequently extended (with clarifications and modifications) through the present day. This includes (but is not limited to) his April 16 proclamation. Ex. 3. Other state authorities issued similar accompanying orders.

56.     Similar orders were also adopted by the Mayor of Honolulu on or around March 18, the Mayor of Kauai on March 21 and 24, and the Mayor of Maui on or around March 22 and April 27 subsequently extended.  See, e.g., Ex. 4–8.

57.     Collectively, the above-referenced orders of the Governor of Hawaii, state of Hawaii (and related authorities), Mayor of Honolulu (and related authorities), Mayor of Kauai (and related authorities) and Mayor of Maui (and related authorities) are referred to herein as the "Orders."

58.     On March 28, 2020 the United States Department of Homeland Security issued a memorandum concerning the "Identification of Essential Critical Infrastructure Workers During Covid-19 Response."[16] This memorandum provided guidance for the implementation and standardization of all state shelter in place orders and the restrictions they place on different essential and non-essential businesses.

59.     Statewide efforts similar to Hawaii's have been implemented around the country in response to tens or hundreds of thousands of confirmed inflections.  State governments have required large scale business closures and imposed other limitations on customer and employee movement that prevent businesses from operating and/or force them to suffer losses.

60.     In all, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting dine in service and other operations at businesses like Plaintiff's.[17]  South Dakota is the only state whose government may not yet have enacted such an order at the state level.

61.     As reflected, for example, by an April 10, 2020 proclamation by the City and County of San Francisco, these prohibiting civil authority orders have been issued "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time." Ex. 11. *See also* Ex. 12 (reflecting similar language from Sonoma County).

C.     **Sand People Closes**

62.     In anticipation of and response to the orders, Sand People closed its stores. It ultimately closed all twelve stores for a period of several months.

---

[16] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_1.pdf

[17] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 3, 2020)

63.    Under the Orders, Sand People was forced to close its stores, thereby prohibiting access to and operations at its stores.

64.    Under the Orders, customers were prohibited from accessing Sand People's stores, thereby prohibiting access to, use of, and operations at its stores.

65.    Under the Orders, employees were prohibited from traveling to or accessing Sand People's stores, thereby prohibiting access to, use of, and operations at its stores.

66.    Under the Orders, employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at its stores.

67.    Under the Orders, Sand People lost access to its stores, lost use of its stores, lost use of important or necessary facilities, buildings, and/or income support properties on which its stores depended, and suspended operations at its stores.

68.    Sand People suffered and continues to suffer substantial lost business income and other financial losses.

69.    These extraordinary losses of business income (and concern for its employees' welfare) are precisely why Sand People took out insurance with Defendants that included business interruption coverage, which was meant to cover these losses.

**D.    The Losses From Sand People's Closure Are A Covered Business Interruption**

70.    Sand People purchased an insurance policy from Defendants that included business interruption (and other related) insurance coverage.

71.    Sand People promptly and dutifully paid its premiums to Defendants for almost thirty-five years.

72.    Sand People complied with all other elements of its agreement with Defendants.

73.    Sand People's policy number is A B5 AZC 80910784  (the "Policy").

74.    Sand People's policy was initially issued by Fireman's.

75.    As of 2016, Sand People's policy was issued by Fireman's. *See* Ex. 9 at 4.

76.    Sand People's policy may have been transferred to National Surety Corporation at an unknown time.

77.     In many countries, property insurance is sold on a specific peril basis.  Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.  Most property policies sold in the United States are all-risk property damage policies which cover losses from all causes that are not expressly excluded.

78.     The Policy is an all-risk property damage policy because its terms indicate that it covers all risks which can cause harm to physical property except for risks that are expressly and specifically excluded.  In the "Causes of Loss" form provided to Sand People, Defendants defined "Covered Causes of Loss" as covering "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded . . . or b. Limited." *Id.* at 31.

79.     The Policy provides coverage for Lost Business Income, promising that Defendants "will pay for the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration.  . . . The suspension must be caused by direct physical loss of or damage to property at [the insured] premises." *Id.* at 33.

80.     The Policy defines a "slowdown or cessation of your business activities" as a suspension for purposes of assessing this coverage. *Id.* at 120.

81.     The Orders prohibited the physical access to, use of, and operations at and by Sand People, its employees, and its customers.  As a result of the Orders, physical components of Sand People's stores became unusable, damaged, and/or lost the ability to generate income.

82.     As a result of this physical loss and/or damage, Sand People suspended operations, lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

83.     The Policy also provides Civil Authority coverage, pursuant to which Defendants agreed that they "will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises." *Id.* at 35.

84.     As the Coronavirus spread, the streets on which Sand People's stores are located, and the buildings and objects in and around them, became a breeding ground for Covid-19.

85.     The Orders were issued as a result of physical loss, physical damage, and dangerous physical conditions occurring in properties outside Sand People's stores and all around cities and business districts.  For example, prior to the issuance of the Orders, government authorities had been limiting access to other properties on the basis of the Coronavirus, including (but not limited to) sporting arenas, concert venues, and other places where large numbers of people may gather.

86.     The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by Sand People, its employees, and its customers.  As a result of the Orders, components of Sand People's stores became unusable and/or lost the ability to generate income.

87.     As a result, Sand People lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

88.     COVID-19 is a Covered Cause of Loss under the Policy.

89.     The Property/Liability Policy Form which defines the Policy's Lost Business Income and Civil Authority coverage (AB 90 00 12 93) is a standardized form drafted by the Insurance Services Office ("ISO").  On information and belief, the form used for the Policy is also used by Defendants for numerous other insurance policies issued by Defendants to the Class members.

90.     The ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

91.     In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents.  Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

92.     When preparing CP 01 40 07 06, ISO, circulated a statement to state insurance regulators that included the following acknowledgement:

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

93.     The insurance industry has thus recognized that the presence of virus or disease can constitute physical damage to property since at least 2006.

94.     Defendants intentionally chose not to include CP 01 40 07 06 in the Policy and in its insurance policies issued to other Class members.

95.     Defendants' awareness of CP 01 40 07 06, and related circumstances and exclusions, is underscored here by its inclusion in the Policy of the Crisis Management Coverage Extension Endorsement which applies to certain events involving the spread of viruses.

96.     The Crisis Management Coverage Extension Endorsement (Form AB 93 24 06 05), and any other Crisis Event limitations, were not triggered and therefore do not limit coverage.

97.     Defendants are aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

98.     Defendants chose not to use force majeure clauses in the Policy or in its insurance policies issued to other Class members.

**E.     Defendants' Denial of Sand People's Insurance Claim**

99.     On or around March 20, 2020, Sand People requested insurance coverage from Defendants. This claim was later assigned the identifying number 00520386714.

100.     At an unknown time, Defendants formally decided that Plaintiff's claim was denied.

101.     Defendants did not notify Sand People promptly once they had decided that the claim was denied, despite repeated requests from Sand People for a prompt coverage decision.

102.   Defendants ultimately sent Sand People a denial letter dated May 22, 2020. Ex. 10.

103.   Defendants decided to deny and denied Sand People's claims without any inspection or review of Sand People's physical locations or documents concerning its business activities in 2020.

104.   Defendants have thereby waived any right to inspect such premises, deny coverage for any reason related to conditions at such location, or raise any defense related to conditions at such location or facts specific to Sand People.

105.   The lack of diligence in the denial of Sand People's claim, and their lack of consideration given to the specific details of the claim, indicate that Defendants could not have engaged in a good faith or reasonable investigation of the claim which included assessment of facts or issues relevant to Sand People.

106.   Defendants accepted the premiums paid by Sand People with no intention of providing lost business income, physical damage, civil authority, or other applicable coverage for claims like those submitted by Sand People and the proposed Class members and which were denied by Defendants.

107.   Defendants' rejection of Sand People's claim was part of a policy by Defendants to limit their losses during the Coronavirus pandemic, notwithstanding that the Policy provides coverage for losses due to loss of use of property and from closure orders issued by civil authorities (among other coverage).

108.   Although industry trade groups have argued that insurance companies do not have the funds to pay claims related to the Coronavirus and will require government assistance, the reality is that insurers are simply trying to minimize their exposure.  "According to data from ratings firm A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for future payouts."[18]

---

[18] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).

109.    Upon information and belief, Defendants collected more than $60 billion in insurance premiums in 2018 alone.[19]  Notwithstanding this, Defendants appear to be categorically denying claims brought by businesses ordered to close following the Coronavirus, including those brought by Plaintiff and the proposed Class.  This deliberate strategy and common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

110.    Defendants' wrongful denial of Sand People's claim was not an isolated incident. Rather, on information and belief, Defendants have engaged in the same misconduct, alleged herein with respect to Sand People, in connection with claims submitted by numerous of Defendants' insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied.

111.    Sand People's claims and those of the proposed Class all arise from a single course of conduct by Defendants: their systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

112.    Defendants' wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage, to Sand People and the other members of the proposed Class.

113.    Defendants' categorical treatment, failure to investigate in good faith, and denial of Sand People's and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

---

[19] https://www.reinsurancene.ws/allianz-posts-highest-net-income-for-10-years-pc-performance-improves/

1   **V.      CLASS ACTION ALLEGATIONS**

2          114.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff

3   brings claims (as further indicated below) on behalf of itself and a "Class" and "Hawaii Subclass"

4   defined as:

5          **Class**

6          All persons or entities in the United States (including its territories and the District of
           Columbia) who own an interest in a business that was insured by Defendants in March
7          2020, was ordered to close in and/or after March 2020 by a governmental order which
           required city, county, or state-wide closures, and made (or attempted to make) a claim
8          with Defendants arising from lost business income (or other losses related to business
           interruption), and did not receive coverage for that claim.

9          **Hawaii Subclass**
           All persons or entities in Hawaii who own an interest in a business that was insured by
10         Defendants in March 2020, was ordered to close in and/or after March 2020 by a
           governmental order which required city, county, or state-wide closures, and made (or
11         attempted to make) a claim with Defendants arising from lost business income (or other
           losses related to business interruption), and did not receive coverage for that claim.

12         115.    Excluded from the Class and Hawaii Subclass are Defendants and their

13  subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class

14  and Hawaii Subclass; governmental entities; and the Judge to whom this case is assigned and the

15  Judge's immediate family. Plaintiff reserves the right to revise the Class and Hawaii Subclass

16  definitions based upon information learned through discovery or as otherwise may be appropriate.

17  All references to the Class below are inclusive of the Subclass (such that all allegations apply by

18  reference specifically to the Subclass).

19         116.    Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiff seeks to represent

20  any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the

21  time of class certification.

22         117.    **Numerosity: Rule 23(a)(1).** The Class and Hawaii Subclass are too numerous and

23  dispersed for joinder of all Class members to be practicable.  On information and belief, the Class

24  and Hawaii Subclass consists of at least hundreds, if not thousands, of persons and entities.  The

25  precise number of Class and Hawaii Subclass members can be ascertained from Defendants'

26  records.  Class and Hawaii Subclass members may be notified of the pendency of this action by

27

28

1    recognized, Court-approved notice dissemination methods, which may include U.S. mail,

2    electronic mail, Internet postings, social media, and published notice.

3          118.    **Commonality: Rules 23(a)(2)**. This action involves significant common

4    questions of law and fact, including, but not limited to:

5          a.   Whether the insurance policies issued by Defendants to Plaintiff and the Class and Hawaii

6               Subclass are all-risk policies?

7          b.   Whether the actions of civil authorities taken in response to the presence or threat of

8               COVID-19 required closure of Class and Subclass businesses?

9          c.   Whether the actions of civil authorities taken in response to the presence or threat of

10              COVID-19 prohibited access at Class and Subclass businesses?

11         d.   Whether Defendants' Business Income coverage applies to a suspension of business

12              caused by COVID-19 and/or related actions of civil authorities taken in response to the

13              presence or threat of COVID-19;

14         e.   Whether Defendants' Civil Authority coverage applies to a loss of business income

15              caused by the orders of local, municipal, city, county, and/or state or national

16              governmental entities requiring the suspension of business during the outbreak of COVID-

17              19 in the United States;

18         f.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the

19              related actions of civil authorities taken in response to the presence or threat of COVID-19

20              breach Defendants' insurance contracts?

21         g.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the

22              related actions of civil authorities taken in response to the presence or threat of COVID-19

23              are an unfair trade practice?

24         h.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the

25              related actions of civil authorities taken in response to the presence or threat of COVID-19

26              are a deceptive trade practice?

27         i.   Whether Plaintiff and the Class members are entitled to a declaratory judgment as to the

28              meaning of their policies?

j.   Whether Defendants' Crisis Event endorsement (and/or limitation) applies to Class and Subclass claims?

119.   ***Typicality: Rule 23(a)(3).*** Plaintiff's claims are typical of the claims of the Class and Hawaii Subclass members whom they seek to represent.  Plaintiff and all Class members and Hawaii Subclass purchased insurance coverage from Defendants that included coverage for business interruption and all had claims denied pursuant to Defendants' misconduct alleged herein.  Plaintiff's claims are based upon the same legal theories as the claims of the other Class and Hawaii Subclass members.

120.   ***Adequacy: Rule 23(a)(4).*** Plaintiff will fairly and adequately represent and protect the interests of the Class and Hawaii Subclass members. Plaintiff has retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer protection litigation. Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor its counsel have interests that conflict with the interests of the other Class members.

121.   ***Rule 23(b)(2).*** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class and Hawaii Subclass, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class and Hawaii Subclass as a whole.

122.   ***Rule 23(b)(3).*** Common questions of law and fact will predominate over any questions, if any, affecting only individual Class and Hawaii Subclass members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The damages or other financial detriment suffered by Plaintiff and the other Class and Hawaii Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the class to individually seek redress for Defendants' wrongful conduct.

123.   Even if Class and Hawaii Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the

1   benefits of single adjudication, economies of scale, and comprehensive supervision by a single

2   court.

3   **VI.    CAUSES OF ACTION**

4                                     **FIRST CAUSE OF ACTION**
                                          **Breach of Contract**
5                              **(On Behalf of Plaintiff and the Class)**

6          124.    Plaintiff re-alleges and incorporates by reference into this cause of action all

7   allegations set forth in paragraphs 1–123 of this Complaint.

8          125.    Plaintiff brings this cause of action on behalf of itself and the proposed Class.

9          126.    At all times relevant herein, Plaintiff and the Class have paid all premiums and

10  fulfilled or performed all obligations they have to Defendants, including those under all relevant

11  insurance policies described in this complaint.

12         127.    Defendants had contractual duties to provide Plaintiff and the Class with insurance

13  coverage, as alleged herein.

14         128.    By their conduct alleged herein, including denying Plaintiff's and the Class

15  members' insurance claims and refusing to perform under the contract, Defendants breached

16  those duties.

17         129.    As a result of Defendants' breaches, Plaintiff and the Class have been damaged in

18  the amount of coverage to which they are entitled their insurance agreements, the premiums they

19  paid, and in an amount to be proved at trial.  Plaintiff seeks compensatory damages with interest

20  thereon for itself and the Class members.

21         130.    Sand People considered options for mitigating its lost income but could not find

22  any that would be workable (or revenue positive).  Prior to COVID-19, Sand People did not sell

23  products by mail or over the internet. Sand People considered but could not shift to an alternative

24  business model because of how its business operates, and other practical constraints.

25  Approximately one month ago, Sand People partially re-opened two of its stores, which have not

26  been able to mitigate the lost income.

27

28

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Class)

131. Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in paragraphs 1–123 of this Complaint.

132. Plaintiff brings this cause of action on behalf of itself and the proposed Class.

133. When Defendants entered their agreements with Plaintiff and the Class, and with any successive amendments thereto, Defendants undertook and were bound to covenants implied by law that they would deal fairly and in good faith with Plaintiff and the Class, and not engage in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiff and the Class or defeat the reasonable expectations of Plaintiff and the Class under the their agreements with Defendants.

134. By their conduct alleged herein, Defendants breached the implied covenant of good faith and fair dealing arising out of their agreements with Plaintiff and the Class including but not limited to by: (a) unreasonably and in bad faith denying Plaintiff and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiff's and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of their insurance policies for the purpose of denying coverage due.

135. In committing its breaches, Defendants have acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiff's and the Class members' rights and welfare.

136. As a direct and proximate result of the above-referenced breach, Plaintiff has had to retain attorneys to enforce its rights, and those of the proposed Class, to the insurance coverage to which they are entitled and have thereby been injured and damaged.

137. Plaintiff and the Class, therefore, are entitled to recover and seek in connection with this Cause of Action, for itself and the Class: (a) an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution

in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; (b) costs of suit; and (c) reasonable attorney's fees in connection with this action.

### THIRD CAUSE OF ACTION
### Unfair or Deceptive Trade Practices
### HI Rev Stat § 480-1 *et seq.*
### (On Behalf of Plaintiff and the Hawaii Subclass)

138. Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in paragraphs 1–123 of this Complaint.

139. Plaintiff brings this cause of action on behalf of itself and all Hawaii Subclass members.

140. The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"

141. Plaintiff and Subclass members are persons within the meaning of HI Rev Stat § 480-1 et seq. (the "Act" or "UDAP").

142. Defendants' conduct alleged herein was part of trade or commerce.

143. This trade or commerce affected the people of the state of Hawaii.

144. Defendants' conduct directly harmed the people of the state of Hawaii.

145. The state of Hawaii has an interest in regulating Defendants' conduct described herein which occurred in, caused harm in, or is connected to the State of Hawaii.

146. Defendants' conduct alleged herein violates the "unfair" prongs of the Act, including but not limited to Defendants': (a) categorical and wrongful denial of Plaintiff's and the Subclass members' claims under the circumstances described in this complaint; (b) failure and refusal to perform a fair, objective, good-faith, and thorough investigation of the claims as required by Hawaii and other applicable law; (c) denial of Plaintiff's and the Subclass members' claims as part of a policy of categorically denying claims related to the Coronavirus; and (d) failing to interpret their policies in an equitable manner and/or up to the standards required by Hawaii or other applicable law.

1    147.    Defendants' conduct alleged herein violates the "deceptive" prong of the Act.

2    Among other things, Defendants: (a) promised Plaintiff and the Subclass coverage that was not

3    provided and that Defendants had no intention of providing; (b) promised to evaluate each claim

4    individually, reasonably, and in good faith, which Defendants did not intend to do with respect to

5    Plaintiff's and the Subclass members' claims; (c) falsely and misleadingly indicated to Plaintiff

6    and the Subclass that they were investigating in good faith (and had investigated in good faith)

7    their claims which Defendants did not do and knew that it did not do;  (d) collected Plaintiff's and

8    the Subclass members' premiums in exchange for coverage that was not provided, inducing those

9    premiums by promising to evaluate each claim individually, reasonably, and in good faith which

10    Defendants did not do; and (e) denied Plaintiff's and the Subclass members' claim as part of a

11    policy of categorically denying claims related to the Coronavirus as part of a strategy to reduce

12    their total insurance payments related to the Coronavirus.

13    148.    As Plaintiff and the Subclass' insurer, Defendants had an ongoing duty to Plaintiff

14    and the Subclass to refrain from misrepresenting or omitting material information or engaging in

15    other unfair or deceptive conduct.

16    149.    Defendants' misrepresentations and omissions were intentional because they knew

17    that they would mislead Plaintiff and Subclass members and material, because they impacted

18    Plaintiff and Subclass members' insurance decisions.

19    150.    Defendants knew or should have known that this conduct would violate the Act.

20    151.    Defendants' conduct alleged herein also violates Hawaii public policy protecting

21    consumers, small businesses, and insurance policyholders. This includes (but is not limited to)

22    HRS §§  431:1-102, § 431:13, *et seq.*

23    152.    Defendants' unfair and deceptive conduct alleged herein was false, misleading,

24    material had a tendency to deceive reasonable insureds, and did deceive Plaintiff and the

25    Subclass.  Plaintiff and the Subclass members reasonably relied on Defendants' deceptions and

26    omissions alleged herein, including but not limited to by paying premiums to Defendant.

27    153.    As a direct and proximate result of Defendants' unfair and deceptive conduct in

28    violation of the Act, Plaintiff and the Subclass members suffered and continue to suffer

1  ascertainable losses and actual damages, including but not limited to premiums they have paid to

2  Defendants and the non-receipt of insurance benefits that are owed to them by Defendants.

3      154.    Plaintiff and the Class are entitled to restitution from Defendants (with interest

4  thereon), to disgorgement of all Defendants' profits arising out of their violations of the Act (with

5  interest thereon), and to be paid benefits due to Plaintiff and the Subclass members that

6  Defendants has wrongfully retained by means of its violations of the Act.

7      155.    Defendants' deceptive and unfair acts present a continuing risk to Plaintiff and

8  Subclass, as well as to the people of Hawaii and the general public.

9      156.    Pursuant to HI Rev Stat §§ 480-3.1, 480-13, 480-15, 487-14(a), *et seq.* Plaintiff

10  and the Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and

11  awarding damages, treble damages, statutory civil penalties, equitable relief, restitution, punitive

12  damages, attorney's fees, and any other just and proper relief available by law.

13      157.    Pursuant to HI Rev Stat § 480-13.5, *et seq.* Plaintiff and the Subclass seek an

14  additional award of up to $10,000 for each violation directed at a Hawaiian elder. Defendants

15  knew or should have known that its conduct was directed to one or more Subclass members who

16  are elders. Defendants' conduct caused one or more of these elders to suffer a substantial loss of

17  property set aside for retirement or for personal or family care and maintenance, or assets

18  essential to the health or welfare of the elder. One or more Hawaii Subclass members who are

19  elders are substantially more vulnerable to Defendants' conduct because of age, poor health or

20  infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered

21  substantial economic damage resulting from Defendants' conduct.

22  **FOURTH CAUSE OF ACTION**
   **Declaratory Relief**
23  **(On Behalf of Plaintiff and the Class)**

24      158.    Plaintiff re-allege and incorporate by reference into this cause of action all

25  allegations set forth in paragraphs 1–123 of this Complaint.

26      159.    Plaintiff brings this cause of action on behalf of itself and the proposed Class.

27      160.    The Court may declare rights, duties, statuses, and other legal relations, regardless

28  of whether further relief is or could be claimed.

161.     An actual controversy has arisen between Plaintiff and the Class and Defendants as to their respective rights and duties under Plaintiff's and the Class members' insurance policies.

162.     Resolution of the parties' respective rights and duties under Plaintiff's and the Class members' insurance policies by declaration of the Court is necessary, as there exists no adequate remedy at law.

163.     Plaintiff alleges and contends, with respect to Plaintiff's and the Class members' Civil Authority coverage, that the above-described orders trigger that coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit operations at and access to the premises in question, (c) such prohibition was continuous after the orders were issued (d) the orders prohibit access as the direct result of direct physical loss of or damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss, (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiff and the Class have suffered actual and covered loss of income in an amount to be determined at trial, and (g) coverage should begin as of dates to be determined at trial.

164.     Plaintiff alleges and contends that Plaintiff's and the Class members' Lost Business Income Coverage is triggered because (a) Plaintiff and the Class members have sustained actual loss of Business Income due to the closure of their businesses, (b) said closure constitutes a necessary suspension of their operations under their insurance policies, (c) this suspension has been and is caused by direct physical loss of or physical damage to property at the premises in question, including personal property in the open (or in a vehicle) within 1,000 feet of the premises in question, due to the presence of Coronavirus, (d) the presence of Coronavirus is a Covered Cause of Loss, (e) no coverage exclusions or limitations apply to exclude or limit coverage, and (f) some or all of the periods of the Plaintiff's and Class members' closures are within the period of restoration under their insurance policies.

165.     Plaintiff alleges and contends that Defendants wrongly denied coverage with respect to all the foregoing provisions, as to Plaintiff and the Class.

COMPLAINT

1     166.    Upon information and belief, Plaintiff alleges that Defendants dispute and deny

2    each of Plaintiff's contentions set forth in this Cause of Action.

3     167.    Plaintiff, therefore, seeks a declaratory judgment, on behalf of itself and the Class,

4    regarding each of the contentions set forth in this Cause of Action.  A declaratory judgment

5    determining that Plaintiff and the Class are due coverage under their insurance policies, as set

6    forth above, will help to ensure the survival of these businesses during this prolonged closure

7    made necessary by the orders and by the presence of Coronavirus around the businesses during

8    this global pandemic.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of itself and the Class, pray for judgment in their favor and against Defendants, as follows:

    a.    For a declaration adopting each of Plaintiff's contentions set forth in the above Cause of Action for Declaratory Relief;

    b.    For injunctive relief enjoining and restraining Defendants' unfair and/or deceptive conduct as alleged herein, including but not limited to their unfair and/or deceptive business practices and its wrongful denials of coverage under Plaintiff's and the Class' insurance policies;

    c.    For specific performance of the insurance policies;

    d.    For general and compensatory damages, punitive damages, restitution, disgorgement, and attorney's fees in an amount to be determined at trial;

    e.    For treble damages, statutory civil penalties, punitive damages, equitable relief, restitution, attorney's fees, and any other just and proper relief under HI Rev Stat §§ 480-3.1, 480-13, § 480-13.5, 480-15, 487-14(a) , *et seq.*

    f.    For  costs of suit;

    g.    For pre judgment and post-judgment interest; and

    h.    For such other relief as the Court may deem proper.

1   **VIII.    JURY TRIAL DEMAND**

2          Plaintiff demands a trial by jury.

3   DATED this 5th day of June, 2020.

4

5                                        Respectfully Submitted,

6

7   Dated:  June 5, 2020                ____*/s/ Robert J. Nelson*_____
                                         Robert J. Nelson

8                                        Robert J. Nelson (State Bar No. 132797)
                                         Fabrice N. Vincent (State Bar No. 160780)
9                                        Jacob H. Polin (State Bar No. 311203)
                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
10                                       275 Battery Street, 29th Floor
                                         San Francisco, CA  94111-3339
11                                       Telephone:  415.956.1000
                                         Facsimile:  415.956.1008
12

13                                       Judith Ann Pavey (to be admitted *pro hac vice*)
                                         jpavey@starnlaw.com
14                                       STARN O'TOOLE MARCUS & FISHER
                                         A Law Corporation
15                                       Pacific Guardian Center, Makai Tower
                                         733 Bishop Street, Suite 1900
16                                       Honolulu, HI 96813
                                         Telephone: 808.537.6100
17                                       Facsimile: 808.537. 5434
                                         Alexandra L. Foote (State Bar No. 225695)
18                                       LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
                                         275 Battery Street, 29th Floor
19                                       San Francisco, CA  94111-3339
                                         Telephone:  786.408.8083
20                                       Facsimile:  415.956.0561

21                                       *Attorneys for Plaintiff*
                                         Water Sports Kauai, Inc.
22

23

24

25

26

27

28