1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    WATER SPORTS KAUAI, INC.,              Case No.  20-cv-03750-WHO

8                    Plaintiff,
                                            **ORDER GRANTING THE MOTION
9            v.                             TO DISMISS**

10   FIREMAN'S FUND INSURANCE               Re: Dkt. No. 39
     COMPANY, et al.,
11
                     Defendants.
12

13          Plaintiff Water Sports Kauai, Inc., a Hawaii corporation, dba Sand People ("Sand People"),

14   shut down its businesses (twelve stores on three islands that sell gifts, artwork, décor, jewelry,

15   glassware, coastal furnishing, apparel, soaps, lotions, candles, and books) six months ago due both

16   to the spread of the coronavirus and to directives from Hawaii's Governor limiting the operation

17   of non-essential businesses, including Sand People's stores.  Amended Complaint ("AC"), Dkt.

18   No. 38,  ¶ 56.  It submitted a claim for coverage under an insurance policy (Policy) issued by

19   defendants Fireman's Fund Insurance Company, National Surety Corporation, and Allianz Global

20   Risks US Insurance Co (collectively, "defendants") under the "Lost Business Income" and "Civil

21   Authority" provisions.  AC ¶ 4.  That claim was denied, and Sand People filed suit.

22          I agree with the vast majority of cases that have addressed materially similar policy

23   provisions and facts.  Sand People has failed to plausibly plead Business Income or Civil

24   Authority coverage.  Its claims are dismissed with limited leave to amend.

25                                    **BACKGROUND**

26          The Policy provides that the defendants will "pay for direct physical loss of or damage

27   to Covered Property at the premises described in the Declarations caused by or resulting from any

28   Covered Cause of Loss."  AC, Ex. 9 at 30.  In relevant part, the Policy states:

*United States District Court*
*Northern District of California*

3. Covered Causes of Loss

RISKS OF DIRECT PHYSICAL LOSS unless the loss is [excluded].

*Id*. at 31.

g.  Business Income

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your **operations** during the **period of restoration**.
. . .

The suspension must be caused by direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Causes of Loss.

*Id*. at 33.

h. Extra Expense

We will pay necessary Extra Expense you incur during the **period of restoration** that you would not have incurred if there had been no direct physical loss or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet of the described premises, caused by or resulting from a Covered Cause of Loss

*Id*. at 34.

i. Civil Authority

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to two consecutive weeks  from the date of that action.

*Id*. at 35.

15. Period of Restoration means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and
b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

*Id*. at 63.

Based on the spread of the coronavirus, directives from Hawaii's Governor limiting the

2

1   operation of non-essential businesses, including Sand People's stores, and government closure

2   orders issued in 49 other states/jurisdictions as a result of the coronavirus pandemic, and

3   defendants' denial of requests for coronavirus coverage under similarly worded policies, Sand

4   People asserts the following claims on behalf of a class and a subclass: (1) Breach of Contract; (2)

5   Breach of Covenant of Good Faith and Fair Dealing; (3) Unfair or Deceptive Business Practices;

6   and (4) Declaratory Relief.

7          The class and subclass are defined as:

8          **Class**
           All persons or entities in the United States (including its territories
9          and the District of Columbia) who own an interest in a business that
           was insured by Defendants in March 2020 and made (or attempted to
10         make) a claim with Defendants arising from lost business income (or
           other losses related to business interruption) at that business related
11         to COVID-19, and did not receive coverage for that claim.

12         **Hawaii Subclass**
           All persons or entities in Hawaii who own an interest in a business
13         that was insured by Defendants in March 2020 and made (or
           attempted to make) a claim with Defendants arising from lost business
14         income (or other losses related to business interruption) at that
           business related to COVID-19, and did not receive coverage for that
15         claim.

16   AC ¶ 123.

17                                   **LEGAL STANDARD**

18         In Hawaii, "'because insurance policies are contracts of adhesion and are premised on

19   standard forms,'" the contracts must be "construed liberally" in favor of the insured and based on

20   the reasonable expectations of a layperson, with any ambiguities being resolved against the

21   insurer. *Hart v. Ticor Title Ins. Co.,* 126 Hawai'i 448, 456 (2012) (quoting *Dairy Road Partners v.*

22   *Island Ins. Co., Ltd.*, 92 Hawai'i 398, 411- 414 (2000)); *see also Great Divide Ins. Co. v. AOAO*

23   *Maluna Kai Estates*, 492 F. Supp. 2d 1216, 1226–27 (D. Haw. 2007) ("A policy provision is not

24   ambiguous just because the insurer and insured disagree over the interpretation of the terms of a

25   policy. . . .  Ambiguity exists only when the policy 'taken as a whole, is reasonably subject to

26   differing interpretation.'" (quoting *Oahu Transit Servs., Inc. v. Northfield Ins. Co*., 107 Hawai'i

27   231, 236 n. 7 (Haw.2005)).

28

United States District Court
Northern District of California

**DISCUSSION**

Defendants move to dismiss Sand People's claims because the mere threat of coronavirus is insufficient to show a "direct physical loss of or damage to" its covered property and the government closures orders are likewise insufficient to show the same. Defendants note that district courts around the country – including ones in this District and throughout the Ninth Circuit – have rejected identical claims under similar policies and that the only two federal cases Sand People identifies in support of their claims – both from the Western District of Missouri – are distinguishable or wrongly decided. Sand People responds that this case is different from the bulk of district court cases relied on by defendants because (i) it specifically alleges that it had to close its properties due directly to the coronavirus' rapid spread and imminent threat to its businesses, and (ii) the vast majority of district court cases dismissing for lack of coverage also had virus exclusions limitations in their policies.

As described below, I will follow the overwhelming majority of courts that have determined that the mere threat of coronavirus cannot cause a "direct physical loss of or damage to" covered property as required under the Policy. That resolves the issue of coverage under the Business Income and Civil Authority provisions as a result of both the spread of coronavirus and the government closure orders.

I.     **LOST BUSINESS INCOME**

Sand People contends that "lost business income" coverage was triggered by both the "physical" spread of the coronavirus and, independently, the government closure orders. I will address each argument in turn.

A.     **Spread of Coronavirus**

Sand People asserts that it adequately alleged closure because of the "imminent" threat of coronavirus at their properties. AC ¶ 69 ("The Coronavirus and its pernicious spread created inherently dangerous conditions where the stores and property within them were at immediate and imminent risk of exposure to the Coronavirus. This caused them to suspend operations and lose access to the stores, which rendered them untenantable."); ¶ 76 ("Because, inter alia, the spread of Coronavirus rendered Sand People's facilities no longer usable for their intended purpose(s), and

1   in many cases impossible to operate safely, it directly caused them to suffer physical damage and

2   loss.").  It claims that the explosive spread of coronavirus and the imminence of the threat it

3   presented is sufficient to show a "direct physical loss" because the closure is alleged to have

4   resulted from a physical event "the spread of the virus" and potential exposure to a disease.

5          Sand People relies on a series of cases where courts found coverage because asbestos,

6   arsenic, and e-coli contamination were present on covered property.  For example, in *Port Auth. of*

7   *New York and New Jersey v. Affiliated FM Ins. Co*., 311 F.3d 226 (3d Cir. 2002), the Third Circuit

8   interpreted a "physical loss or damage" policy with respect to asbestos and concluded, "[w]hen the

9   presence of large quantities of asbestos in the air of a building is such as to make the structure

10  uninhabitable and unusable, then there has been a distinct loss to its owner.  However, if asbestos

11  is present in components of a structure, but is not in such form or quantity as to make the building

12  unusable, the owner has not suffered a loss."  *Id*. at 236.   The court explained, "'physical loss or

13  damage' occurs only if an actual release of asbestos fibers from asbestos containing materials has

14  resulted in contamination of the property such that its function is nearly eliminated or destroyed,

15  or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release

16  of a quantity of asbestos fibers that would cause such loss of utility. The mere presence of

17  asbestos, or the general threat of future damage from that presence, lacks the distinct and

18  demonstrable character necessary for first-party insurance coverage."  *Id*.

19         That case confirms that there must be sufficient evidence of the *presence* of the

20  contaminant at the property plus an imminent threat from it.  *Id*. at 236 ("We thus find ourselves in

21  agreement with the District Court's ruling that plaintiffs' inability 'to produce evidence

22  concerning the manifestation of an imminent threat of asbestos contamination' forecloses the

23  existence of a viable claim. Although the plaintiffs demonstrated that many of its structures used

24  asbestos-containing substances, those buildings had continuous and uninterrupted usage for many

25  years. The mere presence of asbestos or the general threat of its future release is not enough to

26  survive summary judgment or to show a physical loss or damage to trigger coverage under a first-

27  party 'all risks' policy."); *see also In Assn. of Apt. Owners of Imperial Plaza v. Fireman's Fund*

28  *Ins. Co*., 939 F. Supp. 2d 1059, 1069 (D. Haw. 2013) ("direct physical loss or damage" to property

satisfied where plaintiff demonstrates "that an event had a direct impact and proximately caused a loss related to the physical matter of the Property" and arsenic seeping into the "concrete slab, carpet, and interior objects are physical matter within the ordinary use of those words."); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 826–27 (3d Cir. 2005) (unpublished) ("we believe there is a genuine issue of fact whether the functionality of the Hardingers' property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable" by presence of e-coli in well).  For that reason, it does not help Sand People.

Defendants do not dispute that actual presence of a contaminant at a covered property might trigger coverage.  They argue that what is alleged here – the "mere threat" of exposure – is categorically insufficient to trigger coverage as a direct physical loss of or damage to Sand People's property.  They contend that there must be an incident of a direct physical impact to covered property to trigger coverage and a mere threat does not suffice.  That distinction is supported by *Port Authority*, 311 F.3d at 236, where even though asbestos was in the property – and thus there was some threat of exposure in the future – plaintiff's claims failed because there was insufficient "evidence concerning the *manifestation* of an imminent threat of asbestos contamination." *Id.* at 236 (emphasis added).  Sand People pleads that coronavirus was rapidly spreading and feasibly in Hawaii but fails to allege both its *presence* in any of its properties and a *manifestation* of imminent threat of contamination in any of its properties.

That manifestation is significant because the Policy requires a "direct physical loss of or damage to" property that has not been alleged. *See, e.g., Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 20-CV-03213-JST, 2020 WL 5525171, at *5 (N.D. Cal. Sept. 14, 2020) (dismissing claim for failure to allege COVID-19 or any other physical impetus caused the loss of functionality "where plaintiff "does not allege that 'Covid-19 entered the [property] through any employee or customer" and did not allege that store was closed "because its employees became sick or coronavirus was discovered on the property").  For this reason alone, Sand People's reliance on *Studio 417, Inc. v. Cincinnati Ins. Co*., 20-CV-03127-SRB, 2020 WL 4692385, at *2 (W.D. Mo. Aug. 12, 2020) and *Blue Springs Dental Care, LLC v. Owners Ins. Co*., 20-CV-00383-SRB, 2020 WL 5637963, at *6 (W.D. Mo. Sept. 21, 2020), is unhelpful.  Unlike in those cases – where a hair

United States District Court
Northern District of California

6

United States District Court
Northern District of California

salon, restaurant, and dental practice alleged the *actual* presence of the coronavirus in their

establishments – Sand People only pleads an "imminent threat."  *See also Mudpie,* Inc, 2020 WL

5525171 *6 (distinguishing *Studio 417* because "Mudpie makes no similar allegation here. It does

not allege, for example, that the presence of the COVID-19 virus in its store created a physical

loss.").  There are no facts plausibly alleging an actual exposure at one or more Sand People

stores, much less that an actual physical exposure caused them to close a particular store or set of

stores.[1]

Instead of alleging actual physical exposure, Sand People broadly claims that closing the

stores to avoid imminent exposure is "indistinguishable" from actual exposure in the context of an

insurance contract because it was under a duty to mitigate losses.  Oppo. at 5.  But Sand People

cites no cases finding that similar coverage provisions were triggered without some physical and

direct occurrence on the property in the first instance.  *See, e.g.*,  *Hampton Foods, Inc. v. Aetna*

*Cas. and Sur. Co.*, 787 F.2d 349, 352 (8th Cir. 1986) (plaintiff suffered "direct, concrete and

immediate loss due to extraneous physical damage to the building," and because of "the

unquestioned danger of reentering the building" at risk of collapse, plaintiff was entitled to attempt

to mitigate its damages by "removing and salvaging as much property as it could before the

building's destruction."); *see also Armstrong World Industries, Inc. v. Aetna Cas. & Sur. Co.*, 45

Cal. App. 4th 1, 92 (Cal. App. 1st Dist. 1996) ("remedial costs incurred in cleaning up

contaminated waste sites are covered by CGL policies, but 'prophylactic' costs-costs incurred in

advance of any release of hazardous waste, to prevent threatened future pollution-are not incurred

because of property damage.").[2]

---

[1] During the oral argument, Sand People's counsel admitted that it would not be able to plead facts
that coronavirus actually entered or was otherwise found in one of the Sand People's stores.  I also
note that at least one court has dismissed coverage claims despite plaintiff's allegation that
coronavirus had entered a property.  *See, e.g. Uncork and Create LLC v. The Cincinnati Insurance*
*Company, et al*., No. 2:20-cv-00401, slip op. (S.D.W. Va. November 2, 2020) (granting motion to
dismiss for lack of "physical loss" and concluding that "even when present, COVID-19 does not
threaten the inanimate structures covered by property insurance policies, and its presence on
surfaces can be eliminated with disinfectant. Thus, even actual presence of the virus would not be
sufficient to trigger coverage for physical damage or physical loss to the property.").

[2] Cases confirming coverage where there was physical contamination of properties, therefore, do
not aid plaintiff.  *See* Oppo. at 6-7.

1    Sand People also contends that the significant "gravity of the risk" from coronavirus, as

2    confirmed by the March 2020 government closure orders and which they intend to prove through

3    discovery and expert testimony, "will demonstrate how, in the midst of a global pandemic,

4    Plaintiff's traveler-focused Stores in touristic centers of Hawai'i would have been exposed to

5    Coronavirus had they not closed down." Oppo. 8-9. But it cites no case finding coverage based

6    only on a "would have been exposed" allegation because of a contaminant's rapid spread.

7    Finally, Sand People asserts that coverage is independently required because of "exposure"

8    to coronavirus on other properties in Hawaii that were in the "same tourism and supply chains" as

9    its stores and that third party exposure establishes coverage. Oppo. at 9.[3] However, no specific

10    "income support property" in Sand People's supply chain is identified in the Amended Complaint.

11    Even if one was, Sand People would still need to allege facts showing that the identified income

12    support property itself suffered a direct physical loss, which then caused Sand People a specific

13    loss.

14    **B.    Government Closure Orders**

15    Sand People also contends that the government closure orders independently triggered

16    coverage because (i) it suffered a "loss of" its property and "material alteration" of the property is

17    not required and (ii) deprivation of the functionality of the property triggers coverage. It argues

18    that "loss" broadly includes a deprivation, dispossession, and impairment of property, similar to

19    what it suffered here due to the government orders shutting down non-essential businesses like

20    Sand People's. It asserts that there is no need, under the "loss" prong, to show a "material

21    alteration" of its property (that might otherwise be required under the "damage to" prong).

22    Sand People relies on *Total Intermodal Services Inc. v. Travelers Prop. Cas. Co. of Am.,*

23    CV 17-04908 AB (KSX), 2018 WL 3829767 (C.D. Cal. July 11, 2018). There the court

24

25    _____

26    [3] The Policy provides: "j. Income Support Properties. We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the premises of an income support property not described in the schedule caused by or resulting from any Covered Cause of Loss. Income Support Property means property operated by others on whom you depend to: (1) Deliver material or services to you, or to others for your account; (2) Accept your products or services; (3) Manufacture products for delivery to your customers under contract of sale; or (4) Attract customers to your business." AC, Ex. 9 at 35.

27

28

8

United States District Court
Northern District of California

United States District Court
Northern District of California

1  recognized that the separate "loss *of*" property clause "contemplates that the property is misplaced

2  and unrecoverable, without regard to whether it was damaged," but could include the permanent

3  dispossession of something; there the loss of a shipping container. *Id*. at *3-4. The *Total*

4  *Intermodal* court distinguished "loss of" from "loss to" property, where "loss to" suggests an

5  external force acting on property, and "loss of" connotes simple dispossession or similar harm not

6  "localized" on a segment of property. *Id*. at 3-4; *see also* Oppo. at 10-11.

        In the *Mudpie* case, the Hon. Jon S. Tigar of this District accepted the distinction drawn by

7

8  *Total Intermodal* and rejected the alleged requirement – suggested by defendants here – that there

9  be some physical alteration to the covered property. *Mudpie, Inc*., 2020 WL 5525171 at *4.

10  However, Judge Tigar concluded *Total Intermodal* did not help plaintiffs because while

> Mudpie has been dispossessed of its storefront, it will not be a
> "permanent dispossession" as with the lost cargo in *Total Intermodal*.
> *See* 2018 WL 3829767, at *4. When the Stay at Home orders are
> lifted, Mudpie can regain possession of its storefront. Mudpie's
> physical storefront has not been "misplaced" or become
> "unrecoverable," and neither has its inventory.

15  2020 WL 5525171 at *4.

        The same is true here. As Judge Tigar noted, applying the broader "loss of" coverage, the

16

17  surrounding provisions within the policy at issue there "suggest that Mudpie's inability to occupy

18  its storefront does not fall within the Business Income and Extra Expense coverage of this policy"

19  given the "period of restoration" definition limits the period of coverage to when the property is

20  "repaired, rebuilt or replaced with reasonable speed and similar quality." *Id*. He stated that there

21  was "nothing to fix, replace, or even disinfect for Mudpie to regain occupancy of its property"

22  because its loss was "caused by state closure orders and thus will last for however long those

23  restrictions remain." *Id*. The period of restoration provisions in this case are materially identical

24  and likewise support a conclusion that there has been no covered disposition or "loss of" property

25  because Sand People identifies nothing it needs to fix or replace at any of its properties.

        Sand People takes issue with those two conclusions, arguing that a covered "disposition"

26

27  does not have to be "permanent" and cites to multiple cases where "removeable substances" like

28  asbestos and mold have been found to trigger a "direct physical loss." But, as noted above, those

1    cases do not help Sand People because it has not alleged any *direct physical* anything that

2    happened to or at its specific properties.  Moreover, it has not been dispossessed or deprived *of*

3    any specific property; its inventory and equipment remain.  Instead, it complains of loss of *use,*

4    meaning its inability to operate its stores.

5            Numerous courts have found that materially identical allegations do not trigger coverage

6    under similarly worded policies as a result of government closure orders.  The cases consistently

7    conclude that there needs to be some *physical* tangible injury (like a total deprivation of property)

8    to support "loss of property" or a *physical* alteration or active presence of a contaminant to support

9    "damage to" property.  *See, e.g., Mudpie, Inc.*, 2020 WL 5525171, at *4 ("Although Mudpie has

10   been dispossessed of its storefront, it will not be a "permanent dispossession" as with the lost

11   cargo in *Total Intermodal*. . . .  When the Stay at Home orders are lifted, Mudpie can regain

12   possession of its storefront."); *Real Hospitality, LLC d/b/a/ Ed's Burger Joint v. Travelers*

13   *Casualty Insurance Company of America*, No. 2:20-cv-00087, slip op. (S.W.D.Ms. November 4,

14   2020) (interpreting "loss of" prong in "direct physical loss of or damage to" to mean total

15   dispossession of property); *10E, LLC v. Travelers Indem. Co. of Connecticut*, 2:20-CV-04418-

16   SVW-AS, 2020 WL 5359653, at *4 (C.D. Cal. Sept. 2, 2020) ("Under California law, losses from

17   inability to use property do not amount to 'direct physical loss of or damage to property' within

18   the ordinary and popular meaning of that phrase. Physical loss or damage occurs only when

19   property undergoes a 'distinct, demonstrable, physical alteration.' [] 'Detrimental economic

20   impact' does not suffice." (internal citations omitted)); *see also Travelers Cas. Ins. Co. of Am. v.*

21   *Geragos and Geragos*, CV 20-3619 PSG (EX), 2020 WL 6156584, at *4 (C.D. Cal. Oct. 19,

22   2020) (dismissing claim under "loss of or damage to" language where insured "fails to allege that

23   there was physical damage to the property and concedes that Coronavirus 'has never been detected

24   at [its] property.'"); *Henry's Louisiana Grill, Inc. v. Allied Ins. Co. of Am.*, 1:20-CV-2939-TWT,

25   2020 WL 5938755, at *6 (N.D. Ga. Oct. 6, 2020) (dismissing claims because the "range of

26   contemplated harms aligns with an understanding that 'loss of' means total destruction while

27

28

United States District Court
Northern District of California

10

1    'damage to' means some amount of harm or injury.").[4]

2        Sand People's "deprivation of functionality" argument – namely its inability to operate the

3    stores during the duration of the government closure orders, triggering coverage – fares no better.

4    There is no allegation of any direct physical contact that caused a tangible loss to their property (as

5    in *Total Intermodal*) or the direct physical presence of a contaminant that creates an inability to

6    use or need for remediation (like the actual presence of coronavirus, asbestos, mold, etc.). *See,*

7    *e.g., Assn. of Apt. Owners of Imperial Plaza v. Fireman's Fund Ins. Co*., 939 F. Supp. 2d 1059,

8    1068 (D. Haw. 2013) ("arsenic concentrated and posed a health risk that required abatement").

9        Finally, as in *Mudpie*, viewing the language of the Policy as a whole, the "Period of

10   Restoration" language (during which the Policy covers lost business income and extra expenses)

11   shows the strength of defendants' argument and the weakness of Sand People's. *Mudpie, Inc*.,

12   2020 WL 5525171 at *4; AC, Ex. 9 at 63 (defining the restoration period as beginning on the

13   "date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at

14   the described premises" and ending when "the property at the described premises should be

15   repaired, rebuilt or replaced with reasonable speed and similar quality."). As in *Mudpie*, here

16   there is nothing on any of Sand People's premises that allegedly needs to be repaired, rebuilt or

17   replaced.[5]

18   _____

19   [4] Sand People argues that these cases (and the dozens of other cases that have been similarly

20   decided by district courts) are not persuasive because some of them also addressed virus
     exclusions in the policies at issue. The majority of these courts reasonably determined, first, that

21   coverage was not implicated given the lack of a direct physical event causing loss of or damage to
     property. *See, e.g., Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am*., 20-CV-03213-JST, 2020 WL

22   5525171, at *7 n. 9 (N.D. Cal. Sept. 14, 2020) ("Because Mudpie is not entitled to Civil Authority
     coverage, the Court need not consider Travelers's additional argument that the virus exclusion

23   bars such coverage."); *10E, LLC v. Travelers Indem. Co. of Connecticut,* 2:20-CV-04418-SVW-
     AS, 2020 WL 5359653, at *6 (C.D. Cal. Sept. 2, 2020) ("Plaintiff's FAC does not articulate a

24   theory of Civil Authority coverage clearly enough to allow the Court to adjudicate at this stage
     whether and how the Policy's virus exclusion applies."); *Henry's Louisiana Grill, Inc. v. Allied*

25   *Ins. Co. of Am*., 1:20-CV-2939-TWT, 2020 WL 5938755, at *6 n. 3 (N.D. Ga. Oct. 6, 2020)
     ("Because the Plaintiffs have not pleaded sufficient facts to support a claim for coverage here, this

26   Court will not proceed to analyze the parties' arguments regarding the Virus or Bacteria
     exclusion."). These courts' initial coverage determinations are persuasive here.

27   [5] In post-briefing submissions, plaintiff submits a pair of North Carolina Superior Court decisions
     from October 9, 2020, granting summary judgment to plaintiffs on policies that require only a

28   "direct loss" to Property. Dkt. No. 45. Those decisions are not persuasive. Defendants provide
     four additional district court cases as supplemental authority, including two that are very similar to

United States District Court
Northern District of California

1       Therefore, Sand People has failed to allege a plausible basis for Lost Business Income

2 coverage under either of its theories (the threat of rapidly spreading coronavirus or the Hawaii

3 government closure orders).  This claim is DISMISSED.  Sand People is given limited leave to

4 amend.  It is unlikely to be able to allege the physical presence of coronavirus in any of its covered

5 properties, but it may be able to allege the physical presence of coronavirus and additional facts in

6 support of its "supply chain" theory.

7 **II.      CIVIL AUTHORITY LOSS**

8       Sand People also argues that under the plain language of the Policy, it is entitled to

9 coverage under the Civil Authority provision because the closure orders in Hawaii "prohibited"

10 access to its stores and the orders themselves were issued "in response" to physical loss and

11 damage elsewhere.  Numerous judges, including Judge Tigar in *Mudpie,* have addressed and

12 rejected this argument in this identical posture:

13             Mudpie's allegations establish that the government closure orders
14             were intended to prevent the spread of COVID-19. *See* ECF No. 1 ¶
            24 (California's Safer at Home Order was issued "to control the
15             spread of COVID-19."). Because the orders were preventative – and
            absent allegations of damage to adjacent property – the complaint
16             does not establish the requisite causal link between prior property
            damage and the government's closure order.

17 *Mudpie, Inc.*, 2020 WL 5525171, at *7.

18       The same result is required here.  The preventative closure orders cannot support a causal

19

20 _____

21 this case and highly persuasive.  In the first, *W. Coast Hotel Mgmt., LLC v. Berkshire Hathaway Guard Ins. Cos*., No. 2:20-cv-05663-VAP-DFMx, slip op. (C.D. Cal. Oct. 27, 2020), a Central
22 District judge granted defendants' motion to dismiss on a policy requiring a "direct physical loss of or damage to property" for Business Income coverage and Civil Authority coverage.  Similarly,
23 in *Uncork and Create LLC v. The Cincinnati Insurance Company, et al*., No. 2:20-cv-00401, slip op. (S.D.W. Va. November 2, 2020), the district court dismissed with prejudice claims materially
24 identical to the ones asserted here.  *Id*. (rejecting Business Income and Civil Authority coverages under a "direct physical damage or loss to property" policy despite plaintiffs' assertions of closure
25 due to (1) a direct threat/exposure to coronavirus and (2) government closure orders).  *See also In Raymond H. Nahmad DDS PA v. Hartford Cas. Ins. Co*., No. 1:20-cv-22833-BB, slip op. (S.D.
26 Fla. Nov. 2, 2020) (dismissing Business Income and Civil Authority claims under a "direct physical damage or loss to property" policy); *Real Hospitality, LLC d/b/a/ Ed's Burger Joint v.
27 Travelers Casualty Insurance Company of America*, No. 2:20-cv-00087, slip op. (S.W.D.Ms. November 4, 2020) ("When all of the provisions are read together it makes logical sense that the
28 property that is insured, i.e., the building and/or personal property in or on the building, must first be lost or damaged before Business Income coverage kicks in." . . . "Plaintiff never specifically alleges that the virus is/was present on the restaurant premises." ).

1     link of direct physical loss of or damage to property for the reasons discussed above.  In the

2     absence of any allegation that any specific neighboring property to a Sand People property *in*

3     *Hawaii* had actual coronavirus exposure, this coverage has not plausibly been triggered.  *See*

4     *Sandy Point Dental, PC v. Cincinnati Ins. Co*., 20 CV 2160, 2020 WL 5630465, at *3 (N.D. Ill.

5     Sept. 21, 2020) ("the policy's civil authority coverage applies only if there is a Covered Cause of

6     Loss, meaning a direct physical loss, to property other than the plaintiff's property.  Even then,

7     there is coverage only if the civil authority order, (1) prohibits access to the premises due to (2)

8     direct physical loss to property, other than plaintiff's premises, caused by or resulting from any

9     Covered Cause of Loss."); *In Raymond H. Nahmad DDS PA v. Hartford Cas. Ins. Co*., No. 1:20-

10    cv-22833-BB, slip op. (S.D. Fla. Nov. 2, 2020) (same).

11             This claim is likewise dismissed with limited leave to amend.

12    **III.       REMAINING CLAIMS**

13             Given the failure to plead plausible coverage under any of the provisions of the Policy, I

14    need not reach plaintiff's remaining claims (Unfair or Deceptive Trade Practices, under HI Rev

15    Stat § 480-1 et seq., Breach of Covenant of Good Faith and Fair Dealing, and declaratory relief)

16    because they all fail if the underlying breach of contract claim based on coverage fails.

17             An unfair conduct claim could be premised on defendants' alleged "misrepresentation" of

18    the scope of coverage.  Oppo. at 22.  However, there are no "how and what and where" facts

19    alleged identifying any alleged misrepresentations in the Amended Complaint.  The only time

20    "misrepresent" is used is in paragraph 155 (alleging unfair conduct as "promising coverage to

21    Plaintiffs and the Subclass that was not provided, and that Defendants had no intention of

22    providing").  No specific facts regarding alleged fraudulent acts or misrepresentations are

23    provided.[6]  Sand People is given limited leave to amend this claim to identify the specific

24    misrepresentations it allegedly received regarding the coverage provided by defendants.

25                                            **CONCLUSION**

26             For the foregoing reasons, defendants' motion is GRANTED.  Sand People is given

27    _____

28    [6] The other unfair acts – categorically denying claims and failing to investigate claims – fail if no
      coverage has been plausibly triggered.

United States District Court
Northern District of California

limited leave to amend as described above.  Any amended complaint should be filed within twenty

days of the date of this Order.

**IT IS SO ORDERED.** Dated:

November 9, 2020



William H. Orrick
United States District Judge